Thomas M. VERTIN and Diane L. Vertin, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 87–2079.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1988.

Decided May 2, 1988.

R.E.T. Smith, Wahpeton, N.D., for appellants.

William S. Rose, Jr., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HARRIS,* Senior District Judge.

PER CURIAM.

Thomas M. Vertin and Diane L. Vertin (taxpayer)[1] appeal from the decision of the United States Tax Court[2] determining that they were liable for an income tax deficiency for the tax year 1980. For reversal taxpayer argues that the Tax Court incorrectly determined that an "asset management" fee paid by Midwest Investment Associates I (Midwest) to its accountant/manager was not deductible, thereby barring the deduction by taxpayer of the amount of such fee attributable to taxpayer's one percent interest in Midwest. Secondly, taxpayer argues that the Tax Court incorrectly determined that $50,000 paid by Midwest for an alleged "risk limitation" agreement in connection with its acquisition of a limit-

---

* The Honorable Oren Harris, Senior United States District Judge for the Western District of Arkansas, sitting by designation.

1. Diane L. Vertin is a party to this suit solely by virtue of having filed a joint return with her husband, Thomas M. Vertin, for the year at

issue. Accordingly, references to "taxpayer" herein are to Thomas M. Vertin.

2. The Honorable Daniel J. Dinan, Special Trial Judge. The decision is reported at 56 Tax Ct. Mem.Dec. (P–H) ¶ 87,161 (Mar. 25, 1987).

ed partnership interest in Fountain Plaza Partners (FP) had to be capitalized, thereby barring taxpayer from deducting his distributive share of such amount. For the reasons discussed below, we affirm.

In 1980 taxpayer became a one percent partner in Midwest, a limited partnership which was formed to invest in real estate and obtain rental income. Midwest had thirty-seven limited partners and was managed by Gary Valeske, a certified public accountant. Most of the limited partners were clients of Valeske. Valeske also managed two other partnerships, which in turn invested in ten other partnerships. Some of the partnerships' investments were interlocking.

In September 1980 Midwest acquired a fifteen percent interest in Golf–Links Pantano Associates (Golf–Links), a limited partnership. Golf–Links was formed in 1978 and owned fifty-two acres of land in Tucson, Arizona. Golf–Links planned to sell some of the land and to develop an apartment complex, but there was no evidence of any sales or development by the time of trial. Valeske testified that in 1980 Midwest also acquired an interest in the Westwood Office Park (Westwood), a partnership located in North Dakota. However, the Tax Court found that Midwest did not acquire an interest in Westwood until 1981. On September 29, 1980, Midwest paid Valeske $22,000; half was an "asset management" fee and the other half was an "investment advisory" fee.[3]

On December 1, 1980, Midwest became a limited partner in FP, a limited partnership also located in Tucson. Midwest purportedly acquired an eighty percent interest in FP; its capital contribution was entirely in the form of a $1.56 million promissory note. The general partners of FP were W. Michael Schoff and J. David Mackstaller. On December 1, 1980, FP purchased the Fountain Plaza Apartments and Guest Lodge (an existing development of 180 apartment units and 18 motel units).

Also on December 1, 1980, Midwest entered into a "risk limitation" agreement with Schomac Corp., an Arizona corporation controlled by the general partners of FP (Schoff and Mackstaller). According to Valeske, Midwest was unsure whether it would be able to raise the money to pay off the promissory note and wanted to limit its risk in the event of default. Pursuant to the terms of the "risk limitation" agreement, Midwest could transfer its interests in FP and its obligation under the promissory note to Schomac upon thirty days' notice, before June 1, 1981. Midwest agreed to pay Schomac $50,000 for the "risk limitation" agreement. (Also on December 1, 1980, Midwest and Schomac entered into an "agreement to limit risk by lease." Pursuant to this agreement FP agreed to lease the apartments and the guest lodge to Schomac.)

In May 1981, Midwest informed Schomac that it could not meet the June 1981 installment payment. At that point, pursuant to the terms of the "risk limitation" agreement, Schomac allegedly assumed Midwest's obligation under the promissory note and, as a result, Midwest ended up with only a thirty-one percent interest in FP, instead of an eighty percent interest. Midwest paid Schomac $50,000 in September 1982.

▇▇▇ The Tax Court correctly found that, although designated an "asset management" fee, that part of the "asset management" fee attributable to Valeske's preparation and revision of Midwest's partnership agreement represented non-deductible organization expenses within the meaning of 1954 Code § 709(a).[4] Because Midwest did not elect to amortize organization expenses under 1954 Code § 709(b), any organization expenses had to be capitalized. Similarly, the Tax Court found that that part of the "asset management" fee attributable to Valeske's revision of Midwest's prospectus was a syndication expense with-

---

3. The "investment advisory" fee is not at issue in this appeal.

4. The parties and the Tax Court referred to the Internal Revenue Code of 1954 sections. The

tax year at issue (1980) antedates the Tax Reform Act of 1986, § 2, Pub.L. No. 99–514, 100 Stat. 2085, which redesignated the 1954 Code, as amended, as the Internal Revenue Code of 1986.

in the meaning of 1954 Code § 709(a) that had to be capitalized. Because most of the remainder of "asset management" fee related to services rendered to partnerships other than Midwest, such charges were not deductible as Midwest's ordinary and necessary business expenses under 1954 Code § 162(a).

The Tax Court also found that the $50,000 paid to Schomac pursuant to the "risk limitation" agreement was not an organizational expense subject to amortization under 1954 Code § 195 as a start-up expense. Therefore, the Tax Court found that the "risk limitation" agreement was really a sham transaction and that the $50,-000 payment was part of the purchase price (cost of acquiring a capital asset) that had to be capitalized and could not be deducted as a business expense.

We have carefully reviewed the record and find no error of fact or law. We adopt the analysis of the Tax Court and, accordingly, affirm the decision of the Tax Court. *See* 8th Cir.R. 14.